**AFFIRMED and Opinion Filed January 20, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00705-CV**

**ONE WORLD BANK, Appellant**
**V.**
**VINSYNZIE MILLER, Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-21-05218**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Nowell, and Justice Smith
Opinion by Justice Smith

In two issues, appellant One World Bank appeals the trial court's final judgment granting appellee Vinsynzie Miller's motion for summary judgment and awarding Miller $76,804.40 in attorney's fees incurred in the trial court, as well as certain amounts in attorney's fees for successfully defending an appeal. We affirm.

### Factual and Procedural Background

One World and Empire Exotic Motors, Inc., a car dealership, entered into a floor-plan financing agreement on September 7, 2017, in which One World provided a $1,000,000 revolving line of credit to Empire Exotic to finance its acquisition of

used vehicles. Under the terms of the agreement, Empire Exotic was to pay back the credit when it sold each vehicle. Eric Rioja, Empire Exotic's owner, unconditionally guaranteed the Note, and the loan was secured by Empire Exotic's inventory of floored vehicles.

In May 2019, Empire Exotic purchased a 2014 Ferrari from an auction in Georgia. Miller purchased the Ferrari from Empire Exotic in July 2019, took possession of the vehicle, and was given the Georgia certificate of title. However, at that time, he did not apply for title in his name and gave the certificate of title to his friend Lester Hodges for safekeeping. Hodges helped at Empire Exotic but was not an employee. A few days after his purchase, Miller drove the Ferrari back to Empire Exotic and left it there while he was on vacation. Empire Exotic presented both the Ferrari and the title to One World for a $100,000 advance under the terms of the floor-plan financing agreement, and One World took physical possession of the certificate of title.

In December 2019, after Empire Exotic defaulted on the note, One World brought suit against Empire Exotic and Rioja to recover on the note and guaranty. One World alleged that Empire Exotic sold multiple floored vehicles for which One World held the titles and sold certain floor vehicles without remitting the sales proceeds to One World as required by the loan documents. In addition to its suit on the note and guaranty, One World claimed Empire Exotic and Rioja committed fraud by making false representations that they would remit payments when they sold,

leased, or transferred a floored vehicle and that One World relied on such representations when it made the loan and continued making advances on it. One World also sought a temporary restraining order, temporary injunction, and permanent injunction preventing Empire Exotic from selling, leasing, transferring, or otherwise moving any floored vehicles for which One World held title.

In its first amended petition, One World added John Does 1–50 and the Texas Department of Motor Vehicles as defendants and included a detailed list of twenty-seven floored cars sold without remitting payment to One World. The John Does were those, such as Miller, who purported to have purchased floored vehicles from Empire Exotic and took possession of such vehicles. One World alleged that the John Does conspired with Empire Exotic to deprive One World of its security interest by purchasing the vehicles with the intent to "flip title" to the vehicles using a series of fraudulent mechanic's liens and other illegal means. One World further alleged that Empire Exotic and the John Does intentionally falsified purchase paperwork to induce One World to release title to the vehicles to Empire Exotic.

On January 3, 2020, the trial court granted a writ of sequestration, which included the Ferrari Miller purchased from Empire Exotic. Miller filed a motion to modify and dissolve the writ of sequestration, which the trial court granted on February 21, 2020. In its order, the trial court found that Miller was a good faith purchaser of the Ferrari.

Subsequently, Miller filed a countersuit against One World for conversion and tortious interference with an existing contract. Miller further asserted, as an affirmative defense to One World's claims, that he was a bona fide purchaser of the Ferrari. Miller also moved for summary judgment on both no-evidence and traditional grounds. Miller argued that One World had no evidence of its claims against him for conspiracy and falsifying paperwork to induce One World to release the certificate of title. He moved for traditional summary judgment on his claim that he was a bona fide purchaser and on his cause of action for conversion against One World.

A few days after Miller moved for summary judgment, One World filed a second amended petition seeking a declaratory judgment regarding who owned the floored vehicles sold to the John Does. One World asserted that it currently held the original title to the floored vehicles and Empire Exotic's sale of the vehicles must fail because (1) Empire Exotic did not intend to transfer title at the time of the sale; (2) Empire Exotic and John Does 1-50 prepared false and misleading sales documents to fraudulently induce financial institutions to fund sales for which no title was exchanged; (3) Empire Exotic forged signatures on the sales documents; or (4) Empire Exotic altered or copied out-of-state titles in One World's possession in order to obtain a new title from the Texas Department of Motor Vehicles.

The trial court granted Miller's motion for summary judgment and ordered that (1) One World shall be entitled to a take-nothing judgment against Miller; (2)

One World shall provide Miller with the original certificate of title to the 2014 Ferrari; (3) Miller's damages and attorney's fees be set for a hearing; and (4) One World's suit against Miller be dismissed with prejudice. After a hearing, the trial court ordered One World to pay Miller $76,804.40 in attorney's fees. Miller moved to sever the claims between him and One World from the remaining parties, which the trial court granted.

One World filed a motion seeking a new trial as to the trial court's summary judgment order and the trial court's order awarding Miller attorney's fees. The trial court then entered a final judgment encapsulating its prior rulings to which One World filed an amended motion for new trial. The motion for new trial was overruled by operation of law, and this appeal followed.

## Summary Judgment Standard of Review

We review a summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). When a motion for summary judgment contains grounds for both a traditional summary judgment and no-evidence summary judgment, we consider the no-evidence ground first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

A party, after adequate time for discovery, may move for summary judgment without presenting evidence on the ground that there is no evidence of one or more essential elements of a claim or defense on which the adverse party has the burden of proof. TEX. R. CIV. P. 166a(i). To defeat a no-evidence motion, the nonmovant

must produce evidence raising a genuine issue of material fact on the essential elements of the claim or defense challenged. *Ridgway*, 135 S.W.3d at 600. A nonmovant raises a genuine issue of material fact if it produces more than a scintilla of evidence establishing the existence of the challenged element. *Id.* If the nonmovant fails to produce more than a scintilla of evidence, there is no need to determine whether the movant established it was entitled to summary judgment on those claims or defenses under traditional grounds. *Id.*

A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact. *Lujan*, 555 S.W.3d at 84. We take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019).

### One World's Appeal of Miller's Summary Judgment

On appeal, One World challenges the trial court's grant of summary judgment as to Miller's affirmative defense that he was a bona fide purchaser and that his interest in the Ferrari was superior to One World's. One World argues that its summary judgment evidence showed that Miller was not a bona fide purchaser but, instead, was involved in a plan to cause One World to loan money to Empire Exotic

based on Empire Exotic's purported ownership of the Ferrari. One World relies on the following evidence as support that it raised a genuine issue of material fact as to whether Miller was a bona fide purchaser or whether Miller conspired with Exotic Empire:

- Miller did not take possession of the Ferrari's certificate of title; he left it with Hodges;

- Miller did not take possession of the Ferrari or, if he did, he returned it a short time later and then did not retake possession until after the Ferrari and the certificate of title were taken to One World to secure the $100,000 advance;

- Miller did not sign the buyer's order relating to his purchase of the Ferrari until after One World filed its lawsuit, which was more than six months later;

- Miller did not obtain insurance on the Ferrari until after One World filed its lawsuit;

- Miller did not register the Ferrari in Texas;

- Miller did not obtain hard plates for the Ferrari; and

- Miller never paid the full purchase price (tax, title, and license) for the Ferrari.

One World also asserts that this evidence raises a fact question as to whether One World improperly held the certificate of title as Miller alleged in his conversion claim.

## A. Conspiracy

One World's second amended petition did not expressly allege a conspiracy claim against Miller or John Does 1-50 but was instead limited to Empire Exotic,

Rioja, and four others with regard to the purchase of a McLaren not the Ferrari. Within the fact section of the petition, however, One World asserted that Empire Exotic and John Does 1-50 prepared, reviewed, and executed purchase documents that were materially false and misleading and that they knew they were materially false and misleading when they executed them. Both parties have presented arguments on appeal as if the conspiracy claim against Miller was still pending at the time of summary judgment.

To establish a cause of action for civil conspiracy, a plaintiff must show that two or more persons had a meeting of the minds on an object or course of action to be accomplished and that they completed one or more unlawful acts causing damages as a proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Conspiracy is a derivative tort meaning that a defendant's liability depends on his participation in an underlying tort for which the plaintiff seeks to hold at least one member of the conspiracy liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). In its no-evidence ground for summary judgment, Miller argued that One World had no evidence of (1) an object to be accomplished between Miller and Empire Exotic; (2) a meeting of the minds on the object or course of action between Miller and Empire Exotic; (3) one or more unlawful, overt acts by Miller; or (4) damages caused by Miller.

"[A]n actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination

or agreement." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). One World presented no evidence that Miller knew about Empire Exotic's relationship with One World when he purchased the Ferrari, knew about the floor-plan financing agreement, or knew Empire Exotic was going to use the Ferrari to obtain a $100,000 advance on its line of credit with One World. Evidence that Miller failed to maintain possession of the vehicle and title, register the vehicle, or pay tax, title, and license for the vehicle does not establish that he and Empire Exotic had a meeting of the minds to commit fraud against One World. Thus, One World failed to raise a scintilla of evidence on an element of its conspiracy claim and the trial court did not err in granting Miller's no-evidence motion on that claim.

### B. Conversion

Miller moved for traditional summary judgment on his cause of action against One World for conversion. To establish a claim for conversion, a plaintiff must prove: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. *Guillory v. Dietrich*, 598 S.W.3d 284, 292 (Tex. App.—Dallas 2020, pet. denied). Acting with good faith

or innocence does not constitute a defense to conversion. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).

The uncontested summary judgment evidence showed that, on July 10, 2019, Miller paid $166,000 for the Ferrari to Empire Exotic, via a wire transfer from his brother. Miller was out of town at the time of the purchase. When he returned on July 23, he went to Empire Exotic and took possession of the Ferrari and the certificate of title. He left the certificate of title with Hodges for safekeeping and, within a few days, returned the Ferrari to Empire Exotic to hold while he was again going to be out of town. In November 2019, Miller wanted to sell the Ferrari to an individual who owned a McLaren; Miller would receive the McLaren and $30,000 in the exchange. Miller arranged for Empire Exotic to handle the transaction; however, the sale did not go through because One World had possession of the Ferrari's certificate of title. One World had taken possession of the certificate of title when Empire Exotic presented the Ferrari and the title to One World on July 26, 2019, for the $100,000 advance on the floor-plan loan. On July 2, 2020, after the trial court had found Miller was a good faith purchaser of the Ferrari and dissolved the writ of sequestration, Miller's attorney requested One World to relinquish the certificate of title to Miller. One World declined to release the title.

Miller's conversion claim turns on his ownership rights and whether he was a bona fide purchaser, or buyer in ordinary course, and had superior title to the Ferrari over One World. To determine whether Miller established as a matter of law that he

–10–

had superior title to the Ferrari, we must decide whether the Texas Certificate of Title Act or the Texas Business and Commerce Code governs Empire Exotic's sale of the Ferrari to Miller. *See* TEX. TRANSP. CODE ANN. §§ 501.001–501.179; TEX. BUS. & COM. CODE ANN. §§ 1.101–9.809.

We first turn to whether One World perfected its security interest in the Ferrari. Miller argued that One World failed to perfect its security interest because it did not record its name on the certificate of title when it took possession of the certificate from Empire Exotic and its possession of the certificate was not sufficient. Therefore, Miller asserted, One World could not claim a security interest in the Ferrari that prevented Miller from being a bona fide purchaser. And, because Miller was a bona fide purchaser, he had superior title to the Ferrari that was free and clear of One World's alleged security interest. One World responded that it did perfect its security interest in the Ferrari by filing a UCC Financing Statement and the 2017 Security Agreement with the secretary of State.

The Certificate of Title Act provides:

(a) Except as provided by Subsection (b), a person may perfect a security interest in a motor vehicle that is the subject of a first or subsequent sale only by recording the security interest on the title as provided by this chapter.

(b) A person may perfect a security interest in a motor vehicle held as inventory by a person in the business of selling motor vehicles only by complying with Chapter 9, Business & Commerce Code.

–11–

TRANSP. § 501.111.  Chapter 9 of the business and commerce code provides that a financing statement must be filed to perfect all security interests unless an exception applies.  BUS. & COM. § 9.310(a).

Here, One World filed its UCC financing statement and Security Agreement with the secretary of state on September 8, 2017.  The Security Agreement grants One World a security interest in Empire Exotic's collateral, which includes motor vehicle inventory held at the time of the September 7, 2017 agreement or acquired in the future.  Thus, based on One World's UCC filing regarding its Security Agreement with Empire Exotic, One World held a perfected security interest in the Ferrari when Empire Exotic purchased it from the auction in Georgia to sell at its dealership in Texas.  *See* TRANSP. § 501.111(b).

The business and commerce code also provides that a buyer in ordinary course of business "takes free of a security interest created by the buyer's seller, even if the security interest is perfected."  *Id.* § 9.320(a).  "Buyer in ordinary course of business" is defined in relevant part as:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . . Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Chapter 2 may be a buyer in ordinary course of business.

*Id.* § 1.201(b)(9). "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* § 1.201(b)(20).

Miller argued that he was a bona fide purchaser or buyer in ordinary course because he bought and took possession of the Ferrari for $166,000 from Empire Exotic, which was in the business of selling vehicles, i.e. goods of that kind. Miller testified that he made the purchase without knowledge of the floor-plan financing agreement between Empire Exotic and One World or One World's security interest in the Ferrari as part of Empire Exotic's inventory. Miller maintains that Empire Exotic conveyed good title to him and that his purchase is governed by section 2.401 of the business and commerce code, which provides that "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place." *Id.* § 2.401(b).

One World countered that Miller was not a bona fide purchaser or buyer in ordinary course because he failed to comply with the Certificate of Title Act by failing to receive the title at the time of the transaction. Thus, Miller did not have superior title to the Ferrari. One World relied on sections 501.071 and 501.073 of the Act for support.

Section 501.071 provides that "a motor vehicle may not be the subject of a subsequent sale unless the owner designated on the title submits a transfer of

ownership of the title." TRANSP. § 501.071(a). And, section 501.073 provides that "[a] sale made in violation of this chapter is void and title may not pass until the requirements of this chapter are satisfied." *Id.* § 501.073. However, the Certificate of Title Act also provides that "Chapters 1–9, Business & Commerce Code, control over a conflicting provision of this chapter." *Id.* § 501.005.

For support of his proposition that he had superior title to the Ferrari, Miller relied on *First National Bank of El Campo, Texas v. Buss*, 143 S.W.3d 915, 923–24 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied), which concluded that a purchaser of a vehicle from a car dealership in the ordinary course of business terminates the floor plan financier's security interest in the same vehicle. One World responded that *Buss* conflicted with this Court's opinion in *Gallas v. Car Biz, Inc.*, 914 S.W.2d 592 (Tex. App.—Dallas 1995, writ denied), which supported its contention that Miller was not a buyer in ordinary course because he did not obtain a certificate of title for the Ferrari when he purchased it. We agree with the court's reasoning in *Buss* and find it distinguishable from the *Gallas* line of cases out of this Court.

In *Buss*, like this case, the bank argued that a car dealer's sale of inventory vehicles to buyers did not cut off its perfected lien on the dealer's current and subsequently acquired inventory. 143 S.W.3d at 916–17. Under the floor-plan loan agreement, the bank retained possession of the original certificates of title for the dealership's inventory of used vehicles and released the titles when the dealership

applied the sales proceeds to the loan. *Id.* at 917. The buyers, in separate transactions, purchased vehicles from the dealership but, before they received certificates of title, the dealership defaulted on its promissory note and the bank demanded the dealership and the buyers to return the vehicles. *Id.*

The trial court granted summary judgment for the buyers, finding that the buyers were buyers in ordinary course, that their purchases of the vehicles cut off the bank's inventory security interest in the vehicles, and that each buyer owned their vehicle free and clear of any claim from the bank. *Id.* at 917–18. On appeal, the bank maintained that the Certificate of Title Act governed the dispute and, because the buyers did not obtain new certificates of title in their name when they purchased the vehicles, the sales were void and the buyers were not buyers in the ordinary course of business. *Id.* at 917, 920. The buyers responded that the Texas Business and Commerce Code controlled over any conflict with the Act. *Id.* at 917–18.

The Corpus Christi–Edinburg Court explained that the legislative history of the Certificate of Title Act "clearly evinces the Legislature's determination to resolve conflicts between the Act and the Code in favor of the Code." *Id.* at 921. The court rejected the bank's argument that, because the transactions were void under the Act, the provisions of the business and commerce code did not come into play. *Id.* at 922. Recognizing that the Fifth Circuit and this Court, in *Gallas* and other cases, had "repeatedly held that the Act controls transactions involving the sale of motor vehicles without a proper transfer of the certificate of title," the court

–15–

concluded that such cases (1) did not address the situation presented by a priority dispute between a floor-plan financier and an individual claiming to be a buyer in the ordinary course of business and (2) did not "account for the obvious disparity between the Act and the Code with regard to when title passes." *Id.* The court held that the provisions of the business and commerce code control when establishing the relative rights of a floor-plan financier and a purchaser of a used vehicle from a dealer and, therefore, the buyers were buyers in the ordinary course of business and their purchases cut off the bank's security interest. *Id.* at 923–24; *see also In re Dota*, 288 B.R. 448, 458–64 (S.D. Tex. 2003) (concluding same and explaining that it is the responsibility of the dealer to process title paperwork, not the buyer).

In *Gallas*, a car dealer sold a Ford Explorer to another dealer but retained the certificate of title and began the title process. 914 S.W.2d at 593. The second dealer then sold the Explorer to a consumer. *Id.* at 593. Before the title process was complete, the first dealer's bank notified it that the sight draft provided by the second dealer was no good. *Id.* Because the second dealer never had a certificate of title, he could not transfer title to the consumer. *Id.* at 595. Thus, this Court concluded that the Act controlled the disposition of the case, not the business and commerce code and that the sale from the second dealer to the consumer was void as to the first dealer because title did not pass pursuant to the Act. *Id.* This Court further explained that the consumer was not without a remedy against the second dealer because "a

–16–

sale between the parties is not rendered void by non-compliance with the Act." *Id.* (emphasis omitted).

This case is distinguishable from *Gallas* for two reasons. One, the second dealer's payment in *Gallas* never cleared and the second dealer never had title to transfer to the consumer. *Id.* Here, there is no dispute that Empire Exotic purchased the Ferrari from an auction in Georgia on May 21, 2019, and that Empire Exotic had physical possession of the Georgia certificate of title, which showed that the title had been transferred to Empire Exotic on the same day. Miller testified that, when he purchased the Ferrari, he was physically handed the title but then returned it to Hodges a few days later for safekeeping. One World did not present any evidence challenging the fact that Miller physically received the title and then entrusted it to Hodges. This case is also distinguishable from *Gallas*, as noted in *Buss*, because the case addressed who had superior title in a chain of purchases, not whether a bona fide purchaser's title was superior to a bank's secured interest in the vehicle as inventory. *See Buss*, 143 S.W.3d at 922; *Gallas*, 914 S.W.2d at 594–95.

Although not relied on by One World, we also find this case to be distinguishable from *Allstate Insurance Co. v. Troy's Foreign Auto Parts*, No. 05-00-01239-CV, 2001 WL 840613 (Tex. App.—Dallas July 26, 2001, pet. denied) (not designated for publication). In *Allstate*, this Court concluded that section 2.401(b) of the business and commerce code and section 501.071(a) of the transportation code were not in conflict with one another and, thus, the business and commerce code did

–17–

not control: "We interpret the provision of section 2.401 of the business and commerce code providing that title passes when 'the seller completes his performance with reference to physical delivery of the goods' to encompass the duties of the seller to transfer the certificate of title along with possession of the vehicle." 2001 WL 840613, at *5. But the seller at issue in *Allstate* was an owner, not a dealer and, thus, section 501.071(a) applied. *Id.* at *1, 6. Here, the seller is a dealer, not an owner, and therefore section 501.071(a) does not apply. *See* TRANSP. § 501.002(19) ("'Owner' means a person, other than a manufacturer, importer, distributor, or dealer, claiming title to or having a right to operate under a lien a motor vehicle that has been subject to a first sale."); *In re Dota*, 288 B.R. at 458 (the definition of owner expressly excludes dealers; therefore, section 501.071 does not apply to a sale by a dealer). Moreover, Empire Exotic physically handed Miller the certificate of title when Miller took possession of the Ferrari.

Therefore, we adopt the reasoning of the court in *Buss* and conclude that the business and commerce code governs this dispute. As such, title passed to Miller when he took possession of the Ferrari on July 23, 2019, after already having paid $166,000 for it. *See* BUS. & COM. § 2.401(b).

One World also argued, and maintains on appeal, that it raised a genuine issue of material fact as to whether Miller's purchase of the Ferrari was an ordinary business transaction and that he acted in good faith as defined under the Code. One World contends that, under the "totality of the evidence presented under these

circumstances" there is a fact question as to whether there was honesty in fact and Miller observed reasonable commercial standards of fair dealing when he purchased the Ferrari. We disagree.

The evidence One World relies on—evidence that Miller did not maintain possession of the Ferrari and certificate of title, sign the buyer's order and obtain insurance until after the lawsuit was filed, register the Ferrari, obtain hard plates, or pay full purchase price—does not raise a fact question as to Miller's good faith in making the purchase but rather raises issues with Empire Exotic's conduct in selling the Ferrari and twenty-six other vehicles. One World presented no evidence that contradicted Miller's testimony that he paid $166,000 for the Ferrari and took possession of the Ferrari before Empire Exotic presented it to One World, along with the certificate of title, for a $100,000 advance on the loan. One World has cited to no authority, and we are aware of none, which requires an owner of a vehicle to maintain possession of it in order to claim legal title to it. Miller was free to park his Ferrari wherever he chose. Miller also testified that he could not register the Ferrari or obtain hard plates because One World had the certificate of title and would not return it. Furthermore, the summary judgment evidence showed that Miller did request insurance on the Ferrari and the coverage began July 21, 2019. As to One World's contention that Miller failed to sign the buyer's order, One World has cited to no authority, and we are aware of none, which requires a purchaser of a vehicle to sign a buyer's order or contract in order to have a valid sale. While that may be

the best practice, it does not detract from the fact that Miller paid $166,000 for the Ferrari. And, while the buyer's order listed amounts for tax, title, and license, in addition to the $166,000, there is no evidence that Empire Exotic believed Miller owed that money. As far as Miller and Empire Exotic were concerned, Miller paid for the vehicle in full on July 10, 2019.

Therefore, we conclude that One World did not raise a genuine issue of material fact as to whether Miller was a buyer in the ordinary course of business. Because Miller established as a matter of law that he was a buyer in the ordinary course of business and took the Ferrari free of One World's perfected security interest, *see id.* §§ 2.401(b), 9.320(a), Miller also established that he was entitled to judgment of law on his conversion claim: he owned and had superior title to the Ferrari, One World took possession of the certificate of title to the Ferrari inconsistent with Miller's rights, Miller demanded that One World relinquish the certificate of title, and One World refused. *See Guillory*, 598 S.W.3d at 292. Although One World was unaware that Miller paid $166,000 to Empire Exotic or previously took possession of the Ferrari and certificate of title, acting with good faith or innocence is no defense to a claim of conversion. *Khorshid, Inc.*, 257 S.W.3d at 759. Therefore, the trial court did not err in granting Miller's traditional motion for summary judgment on his claims that he was a buyer in ordinary course, had superior title to the Ferrari, and that One World was liable for conversion.

Having concluded that the trial court did not err in granting summary judgment in favor of Miller on both his no-evidence and traditional grounds, we overrule One World's second issue.

**Attorney's Fees**

In its first issue, One World argues that the trial court erred in awarding Miller attorney's fees under section 70.008 of the Texas Property Code because the claims at issue did not arise from or relate to a possessory lien but rather from One World's security interest or UCC lien.

Whether attorney's fees are recoverable under a particular statute is a question of law that we review de novo. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam). In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). We first look to the statute's plain and common meaning and presume that the legislature intended the plain meaning of its words. *Id.* If we can determine the legislature's intent from the language it used in the statute, we should not look to extraneous matters for an intent the statute does not state. *Id.* "[B]ecause we presume that every word of a statute has been included or excluded for a reason, we will not insert requirements that are not provided by law." *Old Am. Cty. Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004).

Section 70.008 provides: "The court in a suit concerning possession of a motor vehicle, motorboat, vessel, or outboard motor and a debt due on it may award

–21–

reasonable attorney's fees to the prevailing party." TEX. PROP. CODE ANN. § 70.008.

This provision is located in Title 5 of the Texas Property Code: "Exempt Property and Liens." Title 5 is broken down into two subtitles and, contained within the second subtitle, "Liens," is Chapter 70, titled "Miscellaneous Liens." Chapter 70 is divided into six subchapters, the first of which is Subchapter A, titled "Possessory Liens." Section 70.008 is located within that subchapter.

According to One World, Chapter 70 creates specific possessory liens for repairmen, garagemen, stable keepers, pasturers, cotton ginners, and veterinarians. Therefore, because there was no claim for the repair of a vehicle or any other lien under Chapter 70, attorney's fees under section 70.008 were not recoverable. Miller responds that the plain language of the statute clearly provides for an award of attorney's fees in any suit concerning possession of a motor vehicle and a related debt. We agree with Miller.

The plain language of section 70.008 allows for the recovery of attorney fees in "a suit concerning possession of a motor vehicle" and "a debt due on it." There is no language in the statute that requires a possessory lien on the vehicle, although such circumstance would of course be included in the plain meaning of the statute. If the legislature had wanted to restrict recovery to those situations that involved a possessory lien, it could have done so. *See, e.g.*, *id.* §§ 70.306 ("The court in a suit *brought under this subchapter* [Aircraft Repair and Maintenance Lien] may award reasonable attorney's fees to the prevailing party.") (emphasis added); 70.409 ("An

agricultural producer who prevails in an action brought to enforce a *lien created under this subchapter* is entitled to recover . . . reasonable and necessary attorney's fees and court costs.") (emphasis added).

One World cites to *K-Bar Services, Inc. v. English*, No. 03-05-00076-CV, 2006 WL 903735, at *8 (Tex. App.—Austin Apr. 7, 2006, no pet.) (mem. op.), for support of its proposition that the statute requires the suit to involve a possessory lien. Specifically, One World quotes the following language:

> This section is in a subchapter of the property code containing statutes providing for the creation of and foreclosure on liens favoring persons who repair vehicles, repair or clean garments, and provide space to keep animals, vehicles, or crops. No party claims to have held a lien on the truck under any of these sections.

*Id.* (internal citations omitted). But One World failed to quote the remaining portion of the Austin court's reasoning in concluding that the party was not entitled to attorney's fees under section 70.008. The court went on to explain:

> Further, this conversion claim is not a suit for possession of or for a debt on a motor vehicle. Appellants did not want to possess the truck. [Appellee] did not incur a debt in order to purchase the truck, although he admittedly failed to return the sale proceeds when the truck was returned to him. We are not persuaded that this claim is within the purview of section 70.008.

*Id.* As set out above, this case did concern suit for possession of the Ferrari and its title, as well as a debt due on the Ferrari. Thus, *K-Bar Services*, is not instructive.

We conclude that, under the plain meaning of the statute, Miller was entitled to recover attorney's fees because this case involved "a suit concerning possession

–23–

of a motor vehicle" and "a debt due on it." *See* PROP. § 70.008. The trial court did not err in awarding Miller attorney's fees under section 70.008. One World's first issue is overruled.

## Conclusion

We affirm the judgment of the trial court.

/Craig Smith/

CRAIG SMITH

210705F.P05                                                                                              JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ONE WORLD BANK, Appellant

No. 05-21-00705-CV     V.

VINSYNZIE MILLER, Appellee

On Appeal from the 116th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-21-05218. Opinion delivered by Justice Smith. Chief Justice Burns and Justice Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee VINSYNZIE MILLER recover his costs of this appeal from appellant ONE WORLD BANK.

Judgment entered this 20th day of January 2023.